## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **BRADFORD K.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 20 C 1417** |
| | ) | |
| **KILOLO KIJAKAZI, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,[1]** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>ORDER</u>

Plaintiff Bradford K. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the Commissioner's decision should be reversed or the case remanded. The Commissioner responded with a competing motion for summary judgment seeking to affirm the decision. After careful review of the record and the parties' respective arguments, the Court affirms the ALJ's decision.

## <u>BACKGROUND</u>

Plaintiff applied for DIB and SSI on March 9, 2017, alleging in both applications that he became disabled on June 25, 2016 due to broken vertebrae, nerve damage, and a spinal cord injury. (R. 220-21, 227-28, 254). Born in 1967, Plaintiff was 50 years old at

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. She is automatically substituted as the named defendant pursuant to FED. R. CIV. P. 25(d).

the time of his applications, making him a person closely approaching advanced age (age 50-54). (R. 220, 227, 427); 20 C.F.R. § 404.1563(d); 20 C.F.R. § 416.963(d). He graduated from high school and lives in a house with his sister and brother-in-law. (R. 47, 49, 255). Plaintiff has a work history dating back to 1996 performing various jobs. Between 2012 and August 2015, he was a construction worker at several companies, then spent a few months doing side work as a carpenter. (R. 51, 255). He quit working on June 25, 2016 after he passed out at home, hit his head on a coffee table and broke his neck requiring surgery. (R. 52, 56-57).

The Social Security Administration denied Plaintiff's applications initially on September 5, 2017, and again upon reconsideration on November 16, 2017. (R. 81-132). Plaintiff filed a timely request for a hearing and appeared before administrative law judge Jeanette Schrand (the "ALJ") on November 29, 2018. (R. 38). The ALJ heard testimony from Plaintiff, who was represented by counsel, and from a vocational expert ("VE") Allison Shipp. (R. 40-80). On February 12, 2019, the ALJ found that Plaintiff's degenerative disc disease of the cervical and lumbar spine, status-post cervical fusion, and mild bolus emphysema are severe impairments, but that they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 26-27). After reviewing the evidence in detail, the ALJ concluded that Plaintiff has the residual functional capacity ("RFC") to perform light work involving: occasional climbing of ladders, ropes, scaffolds, ramps, and stairs; occasional balancing, stooping, crawling, and crouching; no kneeling; frequent handling and fingering with the dominant right upper extremity; and occasional exposure to pulmonary irritants such as fumes, noxious odors, dust, gases, mists, and poorly ventilated areas. (R. 27-30). The ALJ accepted the VE's

testimony that a person with Plaintiff's background and this RFC could perform a significant number of jobs available in the national economy, and so entered a finding of not disabled.  (R. 30-31).

Plaintiff sought review with the Appeals Council and submitted some additional evidence for consideration, namely, results of a nerve conduction study and EMG test dated March 21, 2019.  (R. 14-17).  The Appeals Council determined that the additional evidence "does not relate to the period at issue" and "does not affect the decision about whether you were disabled beginning on or before February 12, 2019" (the date of the ALJ's decision).  (R. 2).  The Appeals Council thus denied Plaintiff's request for review (R. 1-6), and that decision stands as the final decision of the Commissioner and is reviewable by this Court under 42 U.S.C. §§ 405(g) and 1383(c)(3).  *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005); *Whitney v. Astrue*, 889 F. Supp. 2d 1086, 1088 (N.D. Ill. 2012).

In support of his request for reversal or remand, Plaintiff argues that: (1) the Appeals Council erred in denying his request for review; (2) the ALJ failed to give proper weight to the opinion from his treating primary care physician Manisha J. Ogale, M.D.; and (3) the ALJ erred in failing to have a medical expert conduct an updated review of the evidence.  For the reasons discussed below, the Court finds that the ALJ's decision is supported by substantial evidence.

## DISCUSSION

### A. Standard of Review

Judicial review of the Commissioner's final decision is authorized by the Social Security Act.  42 U.S.C. §§ 405(g), 1383(c)(3).  In reviewing this decision, the Court may

not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "'displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'" *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). *See also L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1151-52 (7th Cir. 2019). The Court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

In making its determination, the Court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)). When the ALJ's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

**B.     Five-Step Inquiry**

To recover DIB or SSI, a claimant must establish that he is disabled within the meaning of the Social Security Act.[2]  *Shewmake v. Colvin*, No. 15 C 6734, 2016 WL 6948380, at *1 (N.D. Ill. Nov. 28, 2016).  A claimant is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.1505(a).  In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy."  *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520).  If the claimant meets his burden of proof at steps one through four, the burden shifts to the Commissioner at step five.  *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

**C.     Analysis**

**1.     Appeals Council Decision**

Plaintiff argues that the case must be reversed or remanded because the Appeals Council failed to properly consider his March 2019 EMG and nerve conduction test results, which he says constituted new and material evidence.  This court's ability to

---

[2]     Because the regulations governing DIB and SSI are substantially identical, for ease of reference, only the DIB regulations are cited herein.

review the Appeals Council's decision "is dependent on the grounds on which the Council declined to grant plenary review." *Stepp v. Colvin*, 795 F.3d 711, 722 (7th Cir. 2015). If the Appeals Council reviewed the evidence and determined it was, "for whatever reason, not new and material, and therefore deemed the evidence 'non-qualifying under the regulation,'" this Court retains jurisdiction to review that conclusion for legal error. *Id*. If, on the other hand, the Appeals Council reviewed the evidence and deemed it new and material but nevertheless concluded that "the record – as supplemented – does not demonstrate that the ALJ's decision was contrary to the weight of the evidence – the Council's decision not to engage in plenary review is discretionary and unreviewable." *Id*. (internal quotations omitted). The parties appear to agree that the Appeals Council rejected Plaintiff's new evidence as non-qualifying. (Doc. 17, at 8-10; Doc. 24, at 8-9). The Court thus proceeds with the limited question of whether that decision was erroneous.

Under the Social Security regulations, the Appeals Council will only consider additional evidence if it is "new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. § 404.970(a)(5). Evidence is "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Stepp*, 795 F.3d at 725. Evidence is "material" if it "creates a reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered." *Id*. (quotations omitted). A claimant must also show "good cause for not informing [the Social Security Administration] about or submitting the evidence" sooner. 20 C.F.R. § 404.970(b).

There can be no dispute that the March 21, 2019 EMG and nerve conduction test results were new because they were created after the ALJ issued her decision on February 12, 2019.  But that creation date also led the Appeals Council to determine that the test results did not relate to the period at issue.  (R. 2).  Plaintiff says this determination was incorrect because the tests were *ordered* on January 23, 2019, before the ALJ issued her decision, and relate to conditions dating back to 2016.  (Doc. 17, at 8, 10).  Defendant responds that regardless of when the tests were ordered, the results reflected Plaintiff's functioning at the time they *occurred*, meaning six weeks after the ALJ's decision.  (Doc. 24, at 9).

"Medical evidence postdating an ALJ's decision is excluded unless it is 'relevant to the claimant's condition during the relevant time period encompassed by the disability application under review.'"  *Robert H. v. Kijakazi*, No. 19 C 7282, 2022 WL 198890, at *4 (N.D. Ill. Jan. 21, 2022) (quoting *Schmidt*, 395 F.3d at 742).  *See also Georgann S. v. Kijakazi*, No. 19 C 7278, 2022 WL 180751, at *6 (N.D. Ill. Jan. 20, 2022) (quoting *Million v. Astrue*, 260 F. App'x 918, 922 (7th Cir. 2008)) ("The time-relevant requirement precludes claimants . . . from submitting post-hearing evidence unless it 'shed[s] light on her impairments and disabilities from the relevant insured period.'").  Though the EMG test and nerve conduction study were not performed until March 21, 2019, the medical signs of carpal tunnel syndrome and left leg pain and weakness that led Plaintiff's physician to order the tests were present as of January 23, 2019.  Since the tests occurred relatively close in time to the precipitating exam and confirmed the new carpal tunnel diagnosis and the presence of reduced flexion in the left hip and foot (R. 14, 17), the results arguably shed light on Plaintiff's impairment prior to February 19, 2019.

The Court need not resolve this question, however, because even accepting that the EMG test and nerve conduction study were time-relevant, the results do not create a "reasonable probability" that the ALJ's decision would change. 20 C.F.R. § 404.970(a)(5). Looking first at Plaintiff's right hand, he started complaining of numbness and tingling in August 2016, shortly after he fell and hit his head on a coffee table. (R. 368). By October 10, 2016, he exhibited finger contractures on the right, was unable to completely close his right hand, and experienced hypersensitivity to light touch in the right arm. A Hoffman's sign was positive bilaterally. (R. 353). Following an October 12, 2016 C3-C4 anterior cervical discectomy and fusion, Plaintiff reported in November 2016 that his right hand functioning had improved 10-20% and he exhibited motor strength of 4/5 in the right arm, though he had markedly decreased rapid alternating movements of the right hand. (R. 512, 515).

Plaintiff continued to complain of constant right hand numbness and tingling on February 10, 2017, as well as pain in the right wrist, notable deformity of his right hand/fingers, involuntary movement of all digits, and difficulty with buttons and writing due to cramping of the fingers. (R. 522). An exam once again showed slightly reduced motor strength and finger abduction of 4/5 on the right and 4/5 strength in the right triceps. (R. 524). During a neurosurgical consultation on March 17, 2017, Plaintiff could not open and close his hands quickly and had positive Hoffman's sign bilaterally. (R. 532). Six months later, on June 19, 2017, Plaintiff had an Internal Medicine Consultative Examination with M.S. Patil, M.D., in connection with his application for disability benefits. Plaintiff was still complaining of mild numbness in his right hand but he had full strength

in his arms, no difficulty with fine and gross manipulation of his hands and fingers, full grip strength of 5/5, and no weakness.  (R. 668, 670).

On October 23, 2017, Plaintiff's treating primary care physician Dr. Manisha Ogale opined that he is capable of frequent handling, fingering, and feeling.  (R. 673).  Several months later, on March 12, 2018, Plaintiff began occupational therapy ("OT") for right arm pain, tingling, and weakness.  (R. 734).  During that initial evaluation, Plaintiff was unable to touch his right thumb to his fifth finger and had slightly reduced strength of 4 to 4+/5 in the right arm.  The therapist instructed Plaintiff to wear a splint on his right wrist.  (R. 892).  Plaintiff subsequently met his goals in OT but was still complaining of right hand numbness and weakness in December 2018.  (R. 784).  On exam, Priya Patel, PA observed slightly reduced strength of 4+/5 in the right arm and positive Hoffman's sign bilaterally.  (R. 785-86).  On January 23, 2019, Plaintiff went to Cook County Health complaining of numbness and tingling in his right hand, poor fine motor movement, and decreased grip strength causing him to drop items.  (R. 1020).  An exam showed slightly reduced grip strength and fingering of 4/5.  (R. 1022).  The doctor recommended that Plaintiff wear a wrist splint at night to help with suspected carpal tunnel syndrome, and ordered an EMG study.  (R. 1023).  The March 21, 2019 nerve conduction and EMG test confirmed that Plaintiff had mild carpal tunnel syndrome on the right with no evidence of acute denervation or chronic re-innervation, and possible sensory ulnar nerve entrapment at the right wrist with demyelinating features only.  (R. 17).

The ALJ thoroughly discussed Plaintiff's complaints of right hand weakness and numbness, and noted the consistent medical findings of only slightly reduced strength of 4/5.  (R. 28-29).  Based on that evidence, the ALJ accepted Dr. Ogale's opinion that

Plaintiff is capable of frequent as opposed to constant handling and fingering.  (R. 30).  The doctor at Cook County ordered the EMG test and nerve conduction study in January 2019 after observing the same 4/5 grip strength, and the tests themselves showed only mild carpal tunnel syndrome and possible ulnar nerve entrapment requiring use of a wrist splint at night.  (R. 17, 1022-23).  Plaintiff had already received a wrist splint from the occupational therapist in March 2018.  (R. 892).  Absent any evidence that Plaintiff's hand functioning changed or worsened, the Court cannot say there is a reasonable probability that the EMG test and nerve conduction study would have altered the ALJ's decision that Plaintiff can frequently handle and finger.  The tests are thus not "material" and the Appeals Council did not err in failing to consider them.  *Stepp*, 795 F.3d at 725.

With respect to Plaintiff's left leg functioning, the Court addresses the evidence in detail in the next section.  For purposes of the Appeals Council argument, the Court notes that the March 21, 2018 nerve conduction study showed only mild abnormalities at L5-S1 extensor digitorum brevis "suggestive of sub-acute radiculopathy but not diagnostic," slight reduction in left hip and foot flexion of 4/5, impaired sensation at L2-S1, and mild swelling in the left foot.  (R. 14, 17).  Notably, Plaintiff exhibited the same 4/5 left hip flexion and abnormal sensation in the leg some two years earlier in February 2017 (R. 524-25), and the State agency reviewers concluded that he is capable of standing and walking for 6 hours in an 8-hour workday notwithstanding any left leg issues.  The ALJ adopted that exact limitation in the RFC, and Plaintiff provides no argument as to how the new studies of his left leg would have altered this outcome.  *Crespo v. Colvin*, 824 F.3d 667, 673 (7th Cir. 2016) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.").  Nor does Plaintiff claim that his leg

condition changed or worsened after the ALJ issued her decision. On the facts presented, the results of the EMG test and nerve conduction study of Plaintiff's left leg were not material and the Appeals Council once again did not commit reversible error in failing to consider them. *Stepp*, 795 F.3d at 725.

### 2. Dr. Ogale's Opinion

Plaintiff argues the case must still be reversed or remanded for proper consideration of Dr. Ogale's opinion regarding his ability to sit, stand, and walk. A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); see *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). If the opinion is contradicted by other evidence or is internally inconsistent, the ALJ may discount it so long as she provides an adequate explanation for doing so. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). That is to say, the ALJ must offer "good reasons" for discounting a treating physician's opinion, *Scott*, 647 F.3d at 739, and then determine what weight to give it considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) other factors brought to the attention of the ALJ. 20 C.F.R. § 404.1527(c)(2)-(6); see *Simila*, 573 F.3d at 515.

On October 23, 2017, Dr. Ogale completed an RFC questionnaire at the request of Plaintiff's counsel stating that Plaintiff can stand and walk for less than one hour, and sit for less than 6 hours in an 8-hour workday. (R. 673). Dr. Ogale further opined that Plaintiff can occasionally lift up to 20 pounds; frequently lift up to 10 pounds; frequently push and pull with the hands and feet; occasionally climb ramps, stairs, ladders, and ropes; occasionally stoop, kneel, and crouch; and never balance or crawl. (*Id*.). According to Dr. Ogale, Plaintiff is only able to work "less than full time" even though his condition has "improved a lot." (R. 674).

The ALJ largely adopted Dr. Ogale's opinion as to Plaintiff's lifting and postural restrictions and imposed an additional limitation to only occasional exposure to pulmonary irritants to address his mild emphysema. (R. 27). In discounting the sitting, standing, and walking restrictions, the ALJ found them inconsistent with medical evidence showing mild degenerative changes and fairly normal clinical findings. (R. 30). Plaintiff first saw Dr. Ogale on August 23, 2016 with reports of numbness and tingling in his left leg. On exam, he exhibited normal range of motion, full strength, normal gait, and no tenderness, swelling, or deformity. (R. 382, 794). Dr. Ogale diagnosed radiculopathy of the cervical spine and referred Plaintiff for a neurology consultation. (R. 386). On September 9, 2016, Plaintiff had two spinal MRIs. The MRI of the cervical spine showed multilevel degenerative disc and facet arthropathy changes, degenerative changes at C3-C4 resulting in moderate spinal stenosis, and focal cord myelomalacia and severe stenosis of the bilateral neural foramina. (R. 28, 389). The MRI of the lumbar spine showed mild degenerative disc changes, slightly more prominent at L3-L4 and L4-L5, and mild neuroforaminal stenosis, but no significant spinal stenosis. (R. 28, 391).

Plaintiff had a neurological consultation with Milena Stosic, M.D. on October 10, 2016. He complained of intermittent numbness and weakness in the right leg but on exam he had full strength of 5/5 throughout, a normal gait, and only mild 5-/5 reduction in hip flexor strength. (R. 28, 351, 353). A CT scan of the cervical spine, however, revealed severe spinal canal stenosis at C3-C4 with compression of the underlying cervical cord, and Dr. Stosic sent Plaintiff for an immediate neurosurgery consultation. (R. 28, 354, 495). Two days later, on October 12, 2016, Daniel Edelman, M.D. performed a C3-C4 anterior cervical discectomy and fusion. (R. 28, 355). At an appointment with Margaret R. Yeseko, NP on November 22, 2016, Plaintiff reported that his symptoms were mostly unchanged and he still experienced numbness and tingling in his left leg. On exam, Plaintiff had fairly good cervical range of motion and full motor strength of 5/5 in all extremities except the right arm, which was 4/5. He was unable to tandem walk and presented with a stiff gait. (R. 28, 515). The nurse ordered a cervical MRI and x-ray. (*Id*.).

When Plaintiff saw Dr. Ogale on December 13, 2016, he said he was feeling better with 30-50% improvement. He reported no back or neck pain, and he exhibited normal range of motion, normal strength, and normal gait, with no tenderness, swelling, or deformity. (R. 28, 397, 401). Dr. Ogale agreed Plaintiff should proceed with the MRI. (R. 402). That January 27, 2017 test showed persistent, unchanged myelomalacia involving the cervical spinal cord at C3-C4 but no new areas of spinal compromise. (R. 677). On February 10, 2017, Plaintiff saw Lauren E. Springer, NP with ongoing complaints of numbness and tingling in the left leg. He had no gait instability but did report painful dysesthesias (abnormal sensation) that worsened with most activities, including walking.

(R. 28, 522).  Plaintiff exhibited decreased range of motion in the cervical spine on flexion, extension, and rotation, and slightly reduced left hip flexion of 4/5.  All other motor exams were normal (5/5) aside from the right hand (4/5).  (R. 28, 524).  Plaintiff's gait was normal but tandem walking was unstable and he had abnormal sensation to light touch in the arms and left leg.  (R. 28, 525).  He reported no longer taking Norco and relying solely on gabapentin for pain.  (*Id*.).  An x-ray of the cervical spine taken that day showed post-operative changes and mild reduction in the C5-C6 disc height but no instability.  (R. 28, 520).

During an exam with Dr. Ogale on March 14, 2017, Plaintiff reported feeling better and reiterated that he had experienced 30-50% improvement.  (R. 405).  A physical exam was normal, including normal range of motion, normal strength, and normal gait, with no back or neck pain, no tenderness, no swelling, and no deformity.  (R. 409).  A March 16, 2017 x-ray of the cervical spine once again showed post-operative changes with no evidence of instability and minimal retrolisthesis of C4 over C5 on the neutral projection.  (R. 530).  At a follow-up appointment with Dr. Ogale on June 15, 2017, Plaintiff continued to report improvement and denied having any neck or back pain, and his exam was entirely normal.  (R. 28, 685, 689).

At the June 19, 2017 consultative examination with Dr. Patil, Plaintiff complained of mild intermittent back pain when he bent over, mild numbness in the left leg, and an occasional burning sensation in the left thigh.  He otherwise denied pain in the neck or low back and had no complaints about gait dysfunction.  (R. 28, 668).  An exam showed a normal neck with no paravertebral tenderness or spasm; unimpaired sensation; full motor strength in the arms and legs; slightly decreased flexion in the lumbar spine but

otherwise full range of motion in all joints; normal gait with ability to walk 50 feet; normal tandem walking; normal heel-toe walking; normal ability to get up from a chair; normal ability to get on and off the exam table; and normal ability to do squats and arises. (R. 28, 669, 671).

The following month, on August 23, 2017, Plaintiff went to the Community Health Care System emergency department complaining of bilateral mid to low back pain that started earlier that day. On exam he exhibited normal range of motion with some tenderness, as well as a positive Hoffman's sign and bilateral paraspinal muscle spasms. There was also bilateral clonus (involuntary muscle contractions) and hyperreflexia in the left leg. (R. 28, 712). An x-ray showed mild degenerative disc space changes at L3-L4 and L4-L5. (*Id*.). Plaintiff's pain subsequently improved with medication and he was discharged with a diagnosis of muscle spasm. (R. 28, 713-14).

On August 28, 2017, State agency reviewer Charles Kenney, M.D. concluded that Plaintiff can occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; sit, stand, and walk for about 6 hours in an 8-hour workday; push and pull without limitation; occasionally climb ladders, ramps, stairs, ropes, and scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl. (R. 87-88, 98-99). Plaintiff returned to Dr. Ogale on November 1, 2017, less than two weeks after she completed her October 23, 2017 opinion. Though Plaintiff newly complained of lower back and leg pain, his physical exam showed normal range of motion, strength, gait, sensation, reflexes, and motor function. Dr. Ogale referred Plaintiff for physical therapy ("PT") to help with radiculopathy in the lumbar region. (R. 29, 703). On November 13, 2017, State agency reviewer Calixto Aquino, M.D. affirmed Dr. Kenney's RFC assessment. (R. 116-17, 129-30).

Plaintiff attended six PT sessions before seeing Dr. Ogale again on March 1, 2018. (R. 760, 762-63, 764-65, 766, 776, 769). At that time, he complained of ongoing arm weakness but denied having any back or neck pain. (R. 29, 719-20). Plaintiff's exam was normal with full range of motion, full strength, normal gait, normal sensation, normal reflexes, normal motor function, and no swelling or tenderness. (R. 29, 723-24). In April 2018, Plaintiff was discharged from PT and instructed to continue a home exercise program. (R. 774). Eight months later, on December 7, 2018, Plaintiff saw Priya Patel, PA due to complaints of lower back pain. (R. 784). He said the pain radiates into his left leg with associated numbness and tingling, and activity makes the pain worse. (*Id*.). On exam, Plaintiff had full strength of 5/5 in both legs but he had difficulty with tandem walking and standing on one foot with his eyes closed. (R. 786). PA Patel diagnosed radiculopathy of the cervical spine and ordered an MRI and x-rays. (R. 787).

The January 7, 2019 MRI of the cervical spine showed postoperative changes and multilevel degenerative changes of the cervical spine most pronounced at C5-C6 where there was severe right neuroforaminal narrowing. (R. 1029). The January 11, 2019 x-ray of the cervical spine likewise showed degenerative disc disease at C5-C6 similar to the prior x-ray taken on August 23, 2017. (R. 712, 1025). Plaintiff's next exam on January 23, 2019 showed full motor strength throughout (except for 4/5 grip strength and fingering in the right hand), as well as intact passive range of motion. He had decreased sensation to light touch in the left leg and positive clonus, but the doctor characterized his left leg symptoms as "overall non-specific." (R. 1022-23). At the time of the March 21, 2019 nerve conduction study and EMG test, Plaintiff had some mild swelling in his left foot, impaired sensation on the left at L2-S1, and slightly reduced hip flexion of 4/5. (R. 14).

The sensory nerve conduction study and motor nerve conduction study of the left leg also showed mild abnormalities at L5-S1 "suggestive of sub-acute radiculopathy but not diagnostic." (R. 16-17).

Though Plaintiff discusses some of this medical evidence, he ignores the fact that all five of the examinations he had with Dr. Ogale between December 13, 2016 and March 1, 2018 were completely normal with only one report of back and leg pain in November 2017. Plaintiff provides no explanation as to how these normal findings support Dr. Ogale's October 2017 opinion that he is incapable of walking/standing for even an hour a day. The extreme inconsistency between Dr. Ogale's opinion and her own treatment notes constitutes a good reason for the ALJ to discredit that opinion. *See, e.g., Pavlicek v. Saul*, 994 F.3d 777, 781 (7th Cir. 2021) (an ALJ may decline to credit a treating physician's opinion "when the opinion is inconsistent with the physician's treatment notes."); *Recha v. Saul*, 843 F. App'x 1, 5 (7th Cir. 2021) ("[T]he ALJ was correct to afford little weight to [treating opinion] evidence because many of the statements included in the letter . . . were contradicted by [the doctor's] own treatment notes.").

Plaintiff also points to no evidence suggesting that records documenting mild reduction in range of motion in the cervical spine, slightly reduced hip flexion of 4/5, mild reduction in disc height at C5-C6, slight decrease in lumbar flexion, degenerative changes in the spine, difficulty tandem walking, decreased sensation in the left leg, positive bilateral clonus, mild foot swelling, and hyperreflexia reflect such severe dysfunction that he is essentially unable to stand and walk. (R. 515, 520, 524, 530, 609, 712, 786, 1022). Notably, the State agency reviewers both agreed that Plaintiff can sit, stand, and walk for 6 hours in an 8-hour workday, and the ALJ reasonably incorporated that assessment into

the RFC.  *Prill v. Kijakazi*, 23 F.4th 738, 751 (7th Cir. 2022) (ALJ "was permitted to afford great weight to Dr. Chan's opinion as a consulting physician, particularly because the ALJ determined that his opinion was consistent with the objective medical evidence.").  *See also  McCarty v. Barnhart*, 85 F. App'x 528, 531 (7th Cir. 2004) (ALJ fairly rejected treating physicians' "extremely pessimistic functional assessments" that were "inconsistent with other substantial evidence of record.").

Plaintiff finds it significant that during a November 15, 2017 PT session he exhibited reduced hip and left knee strength, bilateral positive straight leg raise, and hypersensitivity to touch in his ankles and feet.  (Doc. 17, at 13) (citing R. 778).  But an exam with Dr. Ogale two weeks earlier on November 1, 2017 was entirely normal (R. 703), and when Plaintiff completed PT on March 5, 2018, he had met his goal of going from sitting to standing five times in 43 seconds.  (R. 935).  Plaintiff stresses that his "Current Impairment Code" at the conclusion of PT was only "60-79%" even though he completed his goal.  (Doc. 17, at 13).  Yet Plaintiff fails to explain what that code signifies, and in any event his exam with Dr. Ogale four days earlier on March 1, 2018 was normal with no complaints of neck, back, or leg pain.  (R. 720, 723-24).

Viewing the record as a whole, the ALJ did not err in failing to adopt Dr. Ogale's opinion that Plaintiff cannot stand and walk for even an hour a day.  The Court is able to trace the ALJ's reasoning and she has sufficiently built a logical bridge between the evidence and her conclusion.  *Charles M. v. Comm'r of Soc. Sec.*, No. 19-CV-1178-JES-JEH, 2021 WL 779979, at *3 (C.D. Ill. Mar. 1, 2021) ("The ALJ need not draft a novel to explain her reasoning.  She must minimally articulate it, such that a reviewing court can trace her reasoning and her decision can be subjected to meaningful review.").  *See also*

*Bruno v. Saul*, 817 F. App'x 238, 241 (7th Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154) ("Substantial evidence is not a high hurdle to clear – it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'").  Plaintiff's request to remand the case for further consideration of Dr. Ogale's opinion is denied.

### 3.    Updated Medical Expert Review

Plaintiff finally argues that the ALJ erred in failing to obtain an updated medical expert review.  Plaintiff notes that the last State agency evaluation occurred in November 2017, more than a year before the ALJ's February 12, 2019 decision, and he says that "[t]oo much evidence" was submitted during the interim period for the ALJ to evaluate without the assistance of a physician.  (Doc. 17, at 13).  According to Plaintiff, the additional evidence includes PT notes from March 2018, an OT note from May 2018, PA Patel's December 7, 2018 evaluation, additional imaging tests from January 2019, and his evaluation at Cook County Health on January 23, 2019 resulting in the doctor ordering an EMG test and nerve conduction study.  (*Id.* at 13-14).

"It is common for there to be a lag between the state agency physicians' reviews and the ALJ's decision, so the fact that new medical records came in after the state agency physicians conducted their reviews, is not, by itself, problematic."  *Shelia M. v. Saul*, No. 20 C 664, 2021 WL 1784775, at *6 (N.D. Ill. May 5, 2021) (citing *Keys v. Berryhill*, 679 F. App'x 477, 481 (7th Cir. 2017)) ("If an ALJ were required to update the record any time a claimant continued to receive treatment, a case might never end.").  It is only a problem for an ALJ to rely on outdated opinions of agency consultants if "later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018).

*See also Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) (remanding where state agency physician did not have access to later medical evidence containing "significant, new, and potentially decisive findings" that could "reasonably change the reviewing physician's opinion").

Plaintiff argues that the evidence he cited regarding his leg functioning was potentially decisive because it "bore on" Dr. Ogale's opinion that he cannot stand or walk for even an hour a day. (Doc. 17, at 14). But Plaintiff once again fails to articulate how the records support Dr. Ogale's opinion, which was contradicted by her own treatment notes showing normal examinations. Nor is there any evidence that Plaintiff's leg functioning changed or worsened significantly after November 2017. *Compare Stage*, 812 F.3d at 1125 (new evidence of a significant hip deformity requiring a total hip replacement "changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment by a non-examining physician and by evaluating himself the significance of [the treating physician's] report.").

The same is true of the evidence concerning Plaintiff's right hand functioning. Plaintiff argues that PT notes, OT notes and medical exams in 2018 and early 2019 "bore on" his testimony that he cannot use his right arm and hand more than occasionally. (Doc. 17, at 15). As discussed earlier, however, Plaintiff's own treating physician found him capable of frequent fingering and handling, and medical imaging and exams routinely produced only mild abnormalities. Even the EMG test which Plaintiff repeatedly cites revealed only mild carpal tunnel syndrome and possible ulnar nerve entrapment requiring nothing more than a wrist splint at night. *Compare Lambert*, 896 F.3d at 776 (ALJ improperly relied on reviewing consultants' opinions rendered *"before* Lambert was

treated by the pain specialist, *before* Dr. Paul fused Lambert's sacroiliac joints in failed attempts to alleviate his pain, *before* Dr. Paul opined that Lambert's pain had worsened and his limitations had degraded since 2011, and *before* the physical therapist found Lambert's functional abilities had diminished.") (emphasis in original).

Viewing the record as a whole, the ALJ did not err in failing to obtain an updated medical expert opinion and the case need not be reversed or remanded for further consideration of that issue.

## CONCLUSION

For reasons stated above, Plaintiff's request to reverse the ALJ's decision is denied, and the Commissioner's Motion for Summary Judgment [23] is granted. The Clerk is directed to enter judgment in favor of the Commissioner.

ENTER:

Dated: May 23, 2022

SHEILA FINNEGAN
United States Magistrate Judge